**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Robert Reimer and Susan Reimer,
individually and as husband and wife,

Plaintiffs,

v.

City of Crookston,
Crookston Public School District #593,
Johnson Controls, Inc., and
KRISS Premium Products, Inc.,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-370 ADM/RLE

---

Paula M. Jossart, Esq., and Michael L. Weiner, Esq., Yaeger, Jungbauer, Barczak, & Vucinovich, P.L.C., Minneapolis, MN, appeared for and on behalf of Plaintiffs.

John E. Hennen, Esq., League of Minnesota Cities, St. Paul, MN, appeared for and on behalf of Defendant City of Crookston.

Richard L. Pemberton, Esq., Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, MN, appeared for and on behalf of Defendant Crookston Public School District No. 593.

Michael S. Ryan, Esq., Murnane, Conlin, White & Brandt, P.A., St. Paul, MN, appeared for and on behalf of Defendant Johnson Controls, Inc.

James T. Martin, Esq., Gislason, Martin & Varpness, P.A., Edina, MN, appeared for and on behalf of Defendant KRISS Premium Products, Inc.

---

## I. INTRODUCTION

On November 7, 2001, the Motions for Summary Judgment of the City of Crookston [Doc. No. 48], Crookston Public School District No. 593 [Doc. No. 70], Johnson Controls, Inc., [Doc. No. 56], and KRISS Premium Products, Inc., [Doc. No. 65] were argued before the undersigned United States District Judge. This is a case where the injuries to the Plaintiff Robert Reimer as a result of

JAN 16 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JAN 16 2002
DEPUTY CLERK

the boiler accident were very severe and extremely unfortunate. However, no liability for those injuries attaches to the Defendants. For that reason, as explained below, the Summary Judgment Motions are granted.

## II. BACKGROUND

### A. The Defendants

The City of Crookston ("City") and the Crookston Public School District No. 593 ("School District") jointly operate the Crookston municipal swimming pool pursuant to a joint powers agreement. The School District owns the pool building and the boiler, and is in charge of boiler operation and maintenance of the swimming pool.[1] Brinkman Dep. at 123-124. The School District has a contract with Johnson Controls, Inc. ("JCI"), to provide some maintenance services for the swimming pool boilers and other boilers at School District facilities.[2] Nelson Dep. at 225, Brinkman Dep. at 41, 100-101, 104. KRISS Premium Products, Inc. ("KRISS"),

---

[1] Although the Joint Recreation and Education Board oversaw general day-to-day pool operations, the Joint Powers Agreement and the Financial Responsibility Statement set forth the respective responsibilities of the City and the School District. The Financial Responsibility Statement paragraph 2 provides:

> It is generally understood and agreed that the School District is financially responsible for: . . . 3) providing routine maintenance and boiler checks; 4) cleaning and inspecting the boiler; 5) providing service contracts for heating controls; . . . and 7) assuming the cost of property and liability insurance.

In practice, Bill Brinkman, the business manager for the School District, made the decisions concerning the boiler at the pool, with final authorization by the Board of Education. Brinkman Dep. at 6-7, 70-71.

[2] Specifically, JCI was contracted to repair or replace on a scheduled basis the automatic temperature controls located at various School District schools. Donahue Dep. at 22. The Planned Service Agreement between the School District and JCI did not include repair or maintenance of the boiler nipples. Donahue Dep. at 66-67, Brinkman Dep. at 110:23-25, 111:1-8, 116:21-25, 117:1.

supplies boiler water chemicals to the swimming pool. Nelson Dep. at 10.

**B. The Facts**[3]

On March 10, 1998, Robert Reimer ("Reimer") went to the Crookston swimming pool in response to a call from Ray Nelson ("Nelson"), the School District's janitor in charge of the swimming pool boiler.[4] Nelson Dep. at 10. Reimer had worked for Gibb & Sons for about 10 years, and was considered to be a boiler repair expert. His duties included troubleshooting on commercial boilers. Reimer Dep. at 50-51, 93. Reimer was an educated, experienced and licensed boiler repairman. Id. at 12-14, 25, 44-46. Months earlier, Nelson had called Reimer to tell him that the boiler at the Crookston swimming pool was "leaking in the tubes," and that "there was a leak in the back of the boiler." Id. at 78-80, 83, 110, 144.

Reimer was at the pool on March 10th to examine the boiler so that he could prepare a cost estimate on retubing the boiler. Id. at 80. To do this, Reimer had to "take a look at everything as far as the job concerns." Id. According to Reimer, this included examining the back of the boiler, because Nelson had mentioned that there was a leak in the back. Id. Reimer also decided to conduct an ultrasonic test at the back of the boiler to check out the integrity of the metal at the bottom of the main boiler vessel shell. Id. at 80-81, 83, 145. Reimer determined the ultrasonic tests were appropriate because "[that was one of the important things, because of the fact that [Nelson] was concerned about this leak in the back of the boiler." Reimer Dep. at 110:17-20. To perform the

---

[3] In this summary judgment context, the evidence is viewed in the light most favorable to Reimer. See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

[4] Nelson had been informed of the presence of moisture on the floor of the boiler room near the left side of the boiler by Ken Stromberg, the Pool Director employed by the Joint Recreation and Education Board. Stromberg Dep. at 33-35, 95-96, 115.

ultrasonic test, it was necessary to lift up the sheet metal outer portion of the boiler, a covering over the main boiler vessel, and then to grind the bottom of the boiler in different spots. Id. at 81, 106.

At the back bottom portion of the boiler, there was a welded fitting hole, called a "bung hole." A plug, called a "nipple," was screwed into the bung hole to contain the water. Id. at 118-119. Before Reimer pulled back the sheet metal outer portion of the boiler, he viewed some evidence of deterioration, rust, and corrosion on the portion of the nipple protruding through the outer covering. After he removed the outer covering, a higher level of rust and deterioration was exposed in the area of the nipple and bung hole. Id. at 101, 135, 138. Reimer testified that from the outside the corrosion did not look that bad, but that after the outer skin of the boiler had been pulled back a substantial amount of corrosion, rust, and other types of deterioration were visible to him. Reimer Dep. at 137:15-16, 138:23-139:7. Reimer nevertheless chose this area to conduct the grinding for the ultrasonic test because "[that] spot . . . was easiest to get at." Id. at 144. Reimer applied the grinder to a spot close to the nipple. Id. at 116. At one point while grinding, Reimer did not have complete control of the grinder, and he attempted to reposition himself to enable grinding in the desired spot. Id. at 119. In so doing, Reimer's left knee accidentally brushed against the corroded nipple. Id. This caused the nipple to break out of the bung hole, releasing the hot water and steam from inside the boiler. Id. As a result, Reimer sustained scalding water and steam burns over 67 percent of his body.

While he was grinding on the boiler, Reimer was able to see well because he was using a "trouble light," or "drop light." Id. at 96, 98, 118, 122. When shown a photograph of the nipple

involved in Reimer's accident,[5] Reimer stated that the nipple's condition was "bad" enough that he would not have gone near it. Reimer Dep. at 149-150. Reimer admitted that the nipple depicted in the photograph looked "terrible," and was such that it was no longer capable of properly functioning. Id. Reimer also testified that he was in charge of deciding how the job would be done, that he made the decision as to where to conduct the ultrasound test, that he knew the boiler was operating and filled with hot water and steam at the time, and that he had the option to say "yes" or "no" to any work with the boiler. Id. at 108-9, 117, 121, 139. Reimer further admitted that he was not misled as to the type of boiler or issues with the boiler on March 10, 1998, and that there was "no way" that Nelson, who was helping him hold back the outer portion of the boiler at the time of the accident, could have warned Reimer about the bad nipple. Id. at 112, 141.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere

---

[5] The parties stipulated that the photographed nipple was the involved nipple. See Stipulation of the Parties set forth in Brinkman Dep. at 64.

allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B. Crookston Public School District No. 593's Motion**

**i. Duty**

For someone to be found negligent, a duty to the injured person must first be established. Zimmer v. Carlton County Co-Op Power Assoc., 483 N.W.2d 511, 513 (Minn. Ct. App. 1992), review denied, June 10, 1992. This determination is a question of law for the court. Id. Under Minnesota law,[6] "vicarious liability does not apply . . . when the injured party is an employee of [an] independent contractor." Id. (citing Conover v. Northern States Power Co., 313 N.W.2d 397, 404 (Minn. 1981)). Two exceptions to this rule exist: an employer may be held personally negligent and therefore liable for the injuries of its independent contractor's employees if (1) the employer retains control over the project, or (2) the land possessor does not inspect the premises for latent or hidden dangers and then warn oncomers. Id. at 513-514. Here, Reimer is an employee of an independent contractor, Gibb & Sons. Thus, for the employer School District to be liable for Reimer's injuries, a duty must be established under one of the two delineated exceptions.

To be held liable for retained control, the employer must retain the general control and supervision of the work done. Id. at 514. The facts establish that the School District relinquished control over the boiler project to Reimer. Reimer testified that he was in charge of deciding how the job would be done, that he made the decision whether, how and where to conduct the ultrasound test, and that he had the option to say "yes" or "no" to any work on the boiler. Id. at 108-9, 117, 121, 139.

[6] "A United States District Court sitting in diversity jurisdiction applies the substantive law of the forum state . . . ." Martin v. Wal-Mart Stores, Inc., 183 F.3d 770, 772 (8th Cir. 1999).

Therefore, this exception does not apply.

For a duty to be established for failure to inspect and warn, the injury must have been caused by a "latent or hidden defect in the property," and not by any "inherent or known danger of the property." Id. Here, the injury was caused by an evident danger, not a latent one. Reimer saw that the boiler nipple was badly corroded, and Reimer knew that the boiler was leaking. Reimer was a boiler repair expert hired specifically to investigate the problem of the leaking boiler. The suspect integrity of the boiler posed an inherent danger. The School District had no duty to warn Reimer of the inherent dangers involved with boiler repair. See id.; see also Sutherland v. Barton, 570 N.W.2d 1, 7 (Minn. 1997) (landowners are not liable for harm caused by known or obvious dangers). Therefore, this exception is also not applicable to the fact pattern of this case. Thus, as a matter of law, the School District owed no duty to Reimer as an independent contractor's employee.

**ii. Primary Assumption of Risk**

Even if the School District did owe Reimer a duty, it is still not liable for his injuries because Reimer assumed the risks involved with boiler repair work. The doctrine of primary assumption of risk is applicable where parties have voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks. Olson v. Hansen, 216 N.W.2d 124, 127 (Minn. 1974). "As to those risks, the defendant has no duty to protect the plaintiff and, thus, if the plaintiff's injury arises from an incidental risk, the defendant is not negligent." Id. Under Minnesota law, the elements of primary assumption of risk are that the plaintiff (1) knew of the risk, (2) appreciated the risk, and (3) voluntarily chose to accept that risk despite having a choice to avoid it. See Walk v. Starkey Machinery, Inc., 180 F.3d 937, 939 (8th Cir. 1999).

Reimer was an expert boiler repairman, with an extensive résumé of training and experience,

including 25 years of experience working on steam boilers and steam piping, with a specialized expertise in high and low pressure boilers. Reimer was aware of the risk of injury from escaping hot water and boiler steam should a nipple or pipe rupture or fail. Reimer also appreciated the risk presented by the particular boiler he had been called to examine. Reimer testified that a substantial amount of corrosion, rust, and other types of deterioration were visible to him before he began grinding on the boiler. Reimer Dep. at 138:23-139:7. Reimer described the condition of the nipple involved in the accident as "bad," "terrible," and no longer capable of performing its function. Id. at 149-150. Reimer had been apprised of a leak in the back of the boiler and he was grinding the boiler in the corroded area of the bung hole specifically to test the uncertain condition and integrity of the boiler in that area. Id. at 80, 144. Finally, Reimer accepted these risks while having the choice to avoid them. Reimer chose to grind on the boiler in the area of the corroded nipple while he was in charge of the job, having the option to say "yes" or "no" to anything he was doing with the boiler. Id. at 121, 139. Reimer assumed the risks inherent in the job of examining the boiler.

Based on the absence of a duty owed to Reimer by the School District, as well as the primary assumption of risk by Reimer of the dangers inherent in his boiler work, the School District's Motion for Summary Judgment is granted.

**C. City of Crookston's Motion**

For the same reasons as were applicable to the analysis of the School District's Motion, the City also did not owe Reimer a duty of care regarding his work on the swimming pool boiler on March 10, 1998. The City's role in directing any control at all over Reimer is even more attenuated than that of the School District. For the reasons stated in section III(B)(ii) above, Reimer's assumption of the risk also precludes the City's liability for his injuries. Therefore, the City's

Motion for Summary Judgment is granted. The City's cross-claim for indemnity against the School District is moot.

**D. Johnson Controls, Inc.'s Motion**

JCI was contracted to repair or replace on a scheduled basis the automatic temperature controls located at various School District schools. Donahue Dep. at 22. The Planned Service Agreement between the School District and JCI did not include repair or maintenance of the boiler nipples. Donahue Dep. at 66-67, Brinkman Dep. at 110:23-25, 111:1-8, 116:21-25, 117:1. As such, JCI owed no duty to Reimer. For the reasons stated in section III(B)(ii) above, Reimer's assumption of the risk also precludes the JCI's liability for his injuries. JCI's Motion for Summary Judgment is granted.

**E. KRISS Premium Products, Inc.'s Motion**

The doctrine of primary assumption of risk does not apply where there is evidence the tortfeasor's conduct enlarged the inherent risk assumed by the claimant. Rusciano v. State Farm Mut. Ins. Co., 445 N.W.2d 271, 272 (Minn. Ct. App. 1989). KRISS supplied chemicals for use in the swimming pool boiler to control unwanted mineral levels. KRISS Mem. at 6. KRISS owed no duty to Reimer on this basis. Reimer alleges that KRISS's negligent chemical water treatment program caused the corrosion in the boiler. Pl. Resp. to KRISS Mem. at 13. However, regardless of the cause of the corrosion in the nipple that failed causing Reimer's injuries, it is undisputed that Reimer was aware of the corrosion before commencing the ultrasound test on the boiler. Reimer Dep. at 101, 135, 137:15-16, 138:23-139:7. The evidence does not show that KRISS's water

treatment enlarged the risk of the corroded nipple beyond the risk inherent in the corrosion itself.[7] For the reasons stated in section III(B)(ii) above, Reimer's assumption of the risk precludes KRISS's liability for his injuries. KRISS's Motion for Summary Judgment is granted. This renders KRISS's cross claim against the School District for indemnity moot.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. City of Crookston's Motion for Summary Judgment [Doc. No. 48] is **GRANTED**,

2. Crookston Public School District No. 593's Motion for Summary Judgment [Doc. No. 70] is **GRANTED**,

3. Johnson Controls, Inc.'s Motion for Summary Judgment [Doc. No. 56] is **GRANTED**, and

4. KRISS Premium Products, Inc.'s Motion for Summary Judgment [Doc. No. 65] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: January 16, 2002

[7] Likewise, none of the other Defendants enlarged the risk in the corroded nipple beyond the known risk Reimer assumed.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.